*AO 91 (Rev. 11/11) Criminal Complaint*

US DISTRICT COURT
WESTERN DIST ARKANSAS
FILED

# UNITED STATES DISTRICT COURT
### for the
### Western District of Arkansas
### Fort Smith Division

MAY **2 1** 2021

**JAMIE GIANI,** Clerk

**By**

Deputy Clerk

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| Billy Joe Taylor | ) |
| *Defendant* | ) |

Case No. 2:21MJ _-2003 -001_

## CRIMINAL COMPLAINT

I, the Complainant in this case, state that the following is true to the best of my knowledge and belief.

### COUNT ONE

From in or around November 2017 until in or around April 2021 in the county of Sebastian, in the Western District of Arkansas and elsewhere, the Defendant, BILLY JOE TAYLOR, together with others, committed health care fraud, that is, to knowingly and willfully execute, and attempt to execute, a scheme to defraud any health care benefit program and to obtain, by means of false and fraudulent pretenses, representations, and promises, any of the money and property owned by, and under the custody and control of, any health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Sections 1347 and 2.

This criminal complaint is based on these facts:

■ Continued on the attached sheet.

*Complainant's Signature*

Matthew Ferguson, FBI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ___5/21/21___

*Judge's signature*

City and State: Fort Smith, Arkansas

Mark E. Ford, United States Magistrate Judge
*Printed name and title*

**REDACTED**

**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT**

I, Matthew Ferguson, Special Agent of the Federal Bureau of Investigation ("FBI") being duly sworn, hereby depose and state as follows:

## I.   INTRODUCTION AND AGENT'S BACKGROUND

1.      I have been employed as a Special Agent with the FBI since September 2009.  Prior to my employment with the FBI, I was employed as a Police Officer and Narcotics Officer by the City of North Little Rock, Arkansas Police Department from 2004 to 2009.  I am currently assigned to the FBI Little Rock Division, Fort Smith Resident Agency where I am tasked with conducting criminal enterprise investigations.  During my career as a Special Agent, I have been involved in a wide variety of investigative matters, including investigations of violations of 18 United States Code § 1343, Wire Fraud and 18 U.S.C. §§ 1956 and 1957, Money Laundering.  During the course of these investigations, I have authored and reviewed multiple Title III wire intercept affidavits, coordinated the execution of search and arrest warrants, conducted physical surveillance, participated in debriefs with confidential sources, analyzed records relating to fraudulent schemes, and communicated with other local and federal law enforcement officers regarding the manner in which individuals involved in major fraud schemes conduct their criminal activities and attempt to hide their ill-gotten gain through various methods of money laundering.

2.      This case is being investigated by the Federal Bureau of Investigation ("FBI"), the U.S. Department of Health and Human Services Office of Inspector General (HHS-OIG) and the Internal Revenue Service-Criminal Investigation ("IRS-CI").

3.      I am submitting this affidavit in support of a criminal complaint charging Billy Joe Taylor ("TAYLOR") with a scheme to Commit Health Care Fraud in violation of 18 U.S.C. §

1347. I am familiar with the facts and circumstances described herein. This affidavit is based upon my personal involvement in this investigation, my training and experience, and information obtained from various law enforcement personnel and witnesses, including information that has been reported to me either directly or indirectly.

4.      Because this affidavit is provided for the limited purpose of establishing probable cause for an arrest, I have not included all information known to me regarding this investigation, but rather, have set forth only those facts necessary to establish probable cause to believe the defendant has committed the charged offenses. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and part only. All figures, times, and calculations set forth herein are approximate.

## II.    THE CHARGED OFFENSES

5.      Federal law makes it a crime for anyone to knowingly or willfully execute or attempt to execute a scheme or artifice: (1) to defraud any health care benefit program or (2) to obtain by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by or under the custody or control of a health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services. 18 U.S.C. § 1347(a).

6.      A "health care benefit program" is defined as "any public or private plan to contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract." 18 U.S.C. § 24(b). In this case, the Medicare program that was billed falls under the definition of a "health care benefit program."

7.    Federal law also provides that "[w]however commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal," and that "[w]however willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal." 18 U.S.C. § 2.

## III.    DEFENDANT AND RELEVANT ENTITIES

### A.    Defendant

8.    Billy Joe Taylor ("TAYLOR"), 42, is a resident of Lavaca, Arkansas.

### B.    The Laboratories

#### Vitas Laboratory LLC

9.    On January 25, 2017, Vitas Laboratory LLC ("Vitas") was formed in Delaware by Defendant TAYLOR and others.  Vitas received CLIA certification[1] on February 28, 2017, with the address 1311 Fort Street, Suite J, Barling Arkansas, and was enrolled to submit claims to Medicare in or around February 2017.

#### Beach Tox LLC

10.    Beach Tox LLC ("Beach Tox") was formed in California on June 16, 2016.  In June 2017, Beach Tox submitted Medicare enrollment paperwork listing: 4025 Spencer St. Unit 303, Torrance, California as the practice location; WITNESS 1 as the owner; and authorizing electronic payments to be made to a J.P. Morgan Chase Bank account ending in 1089 ("Beach Tox Chase Bank account").

---

[1] CLIA (Clinical Laboratory Improvement Amendments) registration and certification by the Centers for Medicare and Medicaid Services ("CMS") is required of all laboratories in the United States before it can accept human samples for diagnostic testing.

IV. **PROBABLE CAUSE TO BELIEVE CRIMES HAVE BEEN COMMITTED.**

A. **OVERVIEW OF THE FRAUD SCHEME**

11.      Beginning January 2017, TAYLOR established Vitas in Barling, Arkansas as a new clinical laboratory.  On February 29, 2020, TAYLOR and INDIVIDUAL A acquired ownership and control of Beach Tox.

12.      TAYLOR and his accomplices used Vitas and Beach Tox to submit false and fraudulent laboratory testing services that were often never provided, and not ordered by the rendering doctors on the claims.  TAYLOR and his accomplices used their access to beneficiary and medical provider information from lab testing orders submitted to Vitas or from records of prior lab testing performed by Beach Tox prior the sale of Beach Tox to TAYLOR and INDIVIDUAL A to submit false and fraudulent claims for urine drug tests and other laboratory tests to Medicare that were not actually ordered or performed, including hundreds of claims submitted for beneficiaries after they died or ceased providing urine samples.  TAYLOR and his accomplices used without authorization the names and social security numbers for beneficiaries, and the names and National Provider Identifiers (NPI) for medical providers to submit these claims.

13.      TAYLOR and his accomplices committed the fraudulent scheme to defraud Medicare through the following three basic steps:

- *First*, TAYLOR and his accomplices established or acquired labs.

- *Second*, the lab would obtain the names and social security numbers for beneficiaries, and the names and National Provider Identifiers ("NPI") for medical providers, either through legitimate lab referrals (Vitas) or pre-acquisition billing records (Beach Tox), and used this information to submit fraudulent claims to Medicare.

- *Third*, TAYLOR hired and trained inexperienced billers to use the provider and beneficiary information to bill Medicare repeatedly for services that were not provided under the names of doctors who never ordered them.

14.     TAYLOR and his accomplices had no access to any working laboratory testing equipment at Beach Tox.  Nevertheless, after TAYLOR acquired Beach Tox, Beach Tox billed Medicare for over $65 million in claims in a short period of time, including more than $3 million for dates-of-service before TAYLOR and his accomplice owned the lab.  No reference labs[2] were identified by Beach Tox in the billing data.

15.     In addition, of the overall $65 million that was billed by Beach Tox in total during the relevant time period, according to Medicare claims data, after the onset of the COVID-19 public health emergency on or about January 31, 2020, Beach Tox billed more than $42 million in false and fraudulent claims, and was paid more than $11 million, including billing for false and fraudulent claims that were billed in combination with claims that were submitted for testing for COVID-19 and other respiratory illnesses. As discussed above, Beach Tox had no access to working laboratory equipment during the time period of the COVID-19 public health emergency.

**B.    TAYLOR Starts Vitas and Controls the Billing**

16.     TAYLOR and WITNESS 2 established Vitas in early 2017.

---

[2] The term "reference laboratory" relates to a laboratory-to-laboratory referral, where a service is performed by one laboratory at the request of another laboratory.  One laboratory (the "referring laboratory") refers a sample for testing to another laboratory for testing.  The "reference laboratory" is the laboratory that receives this sample from the referring laboratory, and the reference laboratory performs the test on this sample. The referring laboratory is permitted to bill Medicare for the test performed by the reference laboratory if they meet one of the following conditions: (i) the referring laboratory was located in, or was part of, a rural hospital; (iii) the referring laboratory was wholly owned by the entity performing such test, the referring laboratory wholly owned the entity performing such test, or both the referring laboratory and the entity performing such test were wholly owned by a third party; or (iii) the referring laboratory did not refer more than 30 percent of the clinical laboratory test for which it received requests for testing during the given calendar year.

**TAYLOR Signs CMS Enrollment Application, Other Forms for Vitas**

17.     On February 20, 2017, TAYLOR signed an application to the Centers for Medicare and Medicaid Services ("CMS") to obtain a CLIA Certification of Registration for Vitas at 1311 Fort Street Suite J, Barling, Arkansas, which was issued on February 28, 2017.

18.     On February 28, 2017, TAYLOR signed a Medicare enrollment application for Vitas in Barling, Arkansas listing 1311 Fort Street, Suite J, Barling, Arkansas 72923 as the practice location and listing TAYLOR as owner and CEO.  The application had a certification statement that TAYLOR attested to and, among other things, stated, "I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and I will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity." TAYLOR was designated as the first authorized official for Vitas and WITNESS 2 as the second.

19.     Records were obtained from Novitas Solutions, Inc. ("Novitas"), the Medicare contractor for Medicare claims submitted by Vitas.  On October 9, 2017, November 17, 2017 and February 23, 2018, TAYLOR signed enrollment forms allowing Vitas to submit Medicare claims electronically through the Novitas's online claim submission portal—Novitasphere Portal.  The enrollment forms, to which TAYLOR attested, stated, among other things, that by signing the form the Provider agreed that it will be responsible for all Medicare claims submitted to CMS or a designated CMS contractor by itself, its employees, or its agents; that it will submit claims that are accurate, complete and truthful; and that it will acknowledge that all claims will be paid with Federal funds and that anyone who misrepresents or falsifies or causes to be misrepresented or falsified any record or other information related to that claim may be subject to a fine and or imprisonment.

20.     On May 15, 2019, TAYLOR signed an electronic funds transfer authorization agreement ("EFT") for Vitas authorizing Medicare to make electronic transfers to a Vitas' Regions

Bank account with account number ending 3319 ("Vitas Regions account"). TAYLOR was the sole authorized person on this account. From February 26, 2019 (when the Vitas Regions account was opened) to August 16, 2019, Medicare paid approximately $3.5 million to this account.

### Interview of WITNESS 2, former business partner

21.     On July 9, 2020, WITNESS 2 provided voluntary and unprotected statements to federal law enforcement agents. WITNESS 2 stated he/she and TAYLOR were originally partners in Vitas but when WITNESS 2 ran out of money to continue to invest in Vitas, TAYLOR brought in other investors and the ownership interest changed with TAYLOR retaining a 28% interest.

22.     WITNESS 2 stated, from the beginning, that TAYLOR had "his own girls" billing for Vitas. TAYLOR was the one who trained every biller and he was the one who ran the billing. At some point, WITNESS 2 went to where the billing was done and asked the lead biller to run some reports for him/her. WITNESS 2 was told the reports would be sent to him/her but, when he/she got to the parking lot, TAYLOR sent him/her a text telling him/her to stay in [his/her] lane. WITNESS 2 understood that to mean that TAYLOR did not want him/her to review the claims that TAYLOR was directing to be submitted.

23.     WITNESS 2 also stated that TAYLOR sent WITNESS 2 and others a text stating he (TAYLOR) was taking over all billing, would put the billers on his payroll, and would charge WITNESS 2 and the other owners for doing the billing. WITNESS 2 learned that in the middle of the night, shortly after WITNESS 2 inquired about the billing information, TAYLOR moved the billing location including the computers from one location in Barling, Arkansas to another location in Barling, Arkansas. WITNESS 2 stated that, after WITNESS 2 asked questions about billing and TAYLOR moved the billing to another location, TAYLOR offered to buy out WITNESS 2 and the other owners of Vitas. WITNESS 2 agreed to this and he/she and the other owners sold their interest in Vitas to TAYLOR in early 2019.

**C.      Vitas Surrenders Its CLIA Certification, Continues Billing Anyway**

24.      Records from CLIA reflect that Vitas surrendered its CLIA certification effective June 28, 2019.  As discussed above, in this affiant's training and experience, Medicare requires that all laboratories be certified by CLIA in order to submit claims to Medicare.  But from July 12, 2019 to September 4, 2019, Vitas submitted Medicare claims listing Vitas as the rendering provider for lab tests with dates of service from June 30, 2019 to August 2, 2019 totaling more than $1.7 million.  Medicare did not pay any of these claims.

**D.      Bank Records Show TAYLOR profited from the Vitas Fraud.**

25.      Records from the Vitas Regions account were obtained.  The bank records show that on February 26, 2019, TAYLOR opened and was the sole authorized person on the Vitas Regions account.  Between February 26, 2019 and August 16, 2019, Medicare payments totaling approximately $3.5 million were deposited into the Vitas Regions account.  Additional bank records received from Regions Bank further reflect that TAYLOR opened, and was the sole authorized person on, a Regions Bank account with account number ending 2476 ("TAYLOR Regions account").  Between February 27, 2019 and August 13, 2019, TAYLOR transferred approximately $631,000 from the Vitas Regions account to the TAYLOR Regions account. Additionally, between June 25, 2019 and August 6, 2019, TAYLOR transferred approximately $1,265,000 from the Vitas Regions account to an account of a person closely related to TAYLOR and, between July 1, 2019 and October 11, 2019, $1,290,200 was transferred from this account to the TAYLOR Regions account.

**E.      TAYLOR and INDIVIDUAL A Purchase Beach Tox, Never Take Over The Lab.**

26.      In early 2020, TAYLOR and INDIVIDUAL A purchased Beach Tox from WITNESS 1.  The negotiation for the purchase was handled on behalf of WITNESS 1 by

WITNESS 3. TAYLOR and INDIVIDUAL A completed the purchase of Beach Tox on February 29, 2020 for $60,000. INDIVIDUAL A signed the purchase agreement and the purchase price was paid with a personal check from TAYLOR in the amount of $27,500 dated February 24, 2020 and a cash deposit of $32,500 on March 2, 2020.

### Interview of WITNESS 3

27.     On March 2, 2021, law enforcement agents interviewed WITNESS 3, the CEO of Consulting Company 1, a company that owns and manages clinical laboratories. WITNESS 3 stated, in approximately 2018, he/she bought a lab named Beach Tox located at 4025 Spencer St. Ste. 303 Torrance, California for his/her relative, WITNESS 1. WITNESS 3 managed the operations of Beach Tox through Consulting Company 1, owned all the Beach Tox lab equipment, and leased the location where Beach Tox was located.

28.     WITNESS 3 stated Beach Tox was listed for sale with a broker in May 2019 and ceased testing in November 2019. In approximately February 2020, WITNESS 3 began negotiating with TAYLOR for the sale of Beach Tox. TAYLOR told WITNESS 3 he operated several pain management clinics and had a large number of lab samples which he did not want to bill through the lab he owned in Arkansas. WITNESS 3 and TAYLOR reached an agreement whereby TAYLOR would purchase the Beach Tox CLIA license from WITNESS 1 for $60,000. TAYLOR and WITNESS 3 also orally agreed that WITNESS 3 would continue to manage and operate the Beach Tox lab in Torrance, California with TAYLOR promising to send samples to Beach Tox for testing and pay WITNESS 3 for each test.

29.     WITNESS 3 provided agents involved in this investigation with a copy of a purchase agreement dated February 29, 2020, which showed that WITNESS 1 sold all interest in Beach Tox and its CLIA license for $60,000 to INDIVIDUAL A. WITNESS 3 stated INDIVIDUAL A was a "front [person]" for TAYLOR and came with TAYLOR to sign the

purchase agreement. WITNESS 3 and INDIVIDUAL A went to the bank together to change the Beach Tox Chase Bank account into INDIVIDUAL A's name.

30.     Chase Bank records confirmed that on March 2, 2020, INDIVIDUAL A became the sole authorized person on the Beach Tox Chase Bank account with TAYLOR being added as an authorized person on March 30, 2020. From March 2, 2020 (with the first Medicare payment occurring on March 23, 2020) to October 19, 2020 (when the account was closed), Medicare paid approximately $13.6 million to this account.

31.     WITNESS 3 stated TAYLOR used a personal check to pay for Beach Tox. WITNESS 3 later provided to agents involved in this investigation a copy of a check for $27,500, which was drawn on a Regions Bank account in the name of TAYLOR and another, dated February 24, 2020, and made payable to Consulting Company 1. WITNESS 3 also produced a deposit slip showing a cash deposit of $32,500 on March 2, 2020. In a subsequent interview, WITNESS 3 stated the check was given to him/her by TAYLOR as partial payment for Beach Tox and that he/she believed that the $32,500 cash deposit into the Consulting Company 1 bank account on March 2, 2020 also came from TAYLOR because WITNESS 3 received a text from TAYLOR advising WITNESS 3 about the cash deposit. Chase Bank records for an account with account number ending 5767, which was opened by INDIVIDUAL A on February 25, 2020, show a withdrawal of $32,500 from this account on March 2, 2020.

32.     WITNESS 3 stated, despite the sale, he/she still owned the lab equipment and leased the suite where the lab was located in Torrance, California. After the sale, TAYLOR never sent any samples to WITNESS 3 for testing. WITNESS 3 eventually gave up on TAYLOR sending him/her samples for testing, removed all lab equipment from the Beach Tox lab, and vacated the premises on July 1, 2020. WITNESS 3 stated he/she knew Beach Tox never did any

lab testing at 4025 Spencer St., Ste. 303, Torrance, California after the purchase by TAYLOR and INDIVIDUAL A because WITNESS 3 owned the lab equipment, the lease was in his/her name, and he/she had the keys to the lab. Therefore, it would not have been possible for TAYLOR to have been operating the Beach Tox at that location without the knowledge of WITNESS 3.

33.     WITNESS 3 stated, when Beach Tox was sold, TAYLOR was given access to the Beach Tox billing system, which was through a company named Kareo. These billing records had confidential private health information, including patient and medical provider information, for previous lab testing done by Beach Tox. TAYLOR was asked to delete this information.

**Interview of WITNESS 4 Regarding Transfer of Beach Tox Billing Records**

34.     On April 13, 2021, law enforcement agents interviewed WITNESS 4. WITNESS 4 is employed as the business manager for Consulting Company 1 and has held this position for approximately seven or eight years. WITNESS 4 stated that he/she was the administrator for the Kareo account used by Beach Tox for billing prior to the sale of Beach Tox. After the sale of Beach Tox, WITNESS 4 worked with TAYLOR on transitioning the Kareo Beach Tox account to TAYLOR.    WITNESS 4 talked on the phone with TAYLOR and emailed him at taylormadelabs@yahoo.com (the same email address given for TAYLOR on the Vitas EFT submitted to Medicare in 2017). WITNESS 4 stated that he/she was concerned about turning over the Beach Tox Kareo account unless there was a guarantee that TAYLOR was going to delete the previous patient records and TAYLOR told him/her that he was going to remove all the patient and doctor information.

35.     Consulting Company 1 also provided federal law enforcement agents involved in this investigation with emails, which corroborate WITNESS 4's statement that he/she told TAYLOR not to bill Medicare using information in the Kareo account from previous claims. On March 9, 2020, WITNESS 4 emailed TAYLOR stating, in part, "Again, please ensure that you are

not using our referring providers as we do NOT want to have duplicate submissions – we are processing for these providers at another lab." On March 9, 2020, WITNESS 4 again emailed TAYLOR (in part), "would have preferred to remove our referring providers if you are planning to maintain kareo [sic].  We still process for these providers and don't want to have duplicate denials due to errors of selecting wrong referring providers." TAYLOR replied, "We have corrected for that since [INDIVIDUAL B] is here.  There wont [sic] be any duplicated for any providers." TAYLOR again emailed WITNESS 4 stating in part, "Currently [INDIVIDUAL B] is removing all old data from kareo [sic].  All providers are being removed and our I.T [sic] department is putting in all of our clinic providers as we speak." WITNESS 4 stated INDIVIDUAL B was one of the key people that worked for TAYLOR doing the billing, and WITNESS 4 talked to INDIVIDUAL B and INDIVIDUAL C who worked as billers at Beach Tox, about the use of the Kareo billing system.

36.    On April 1, 2020, WITNESS 4 emailed TAYLOR, "Did Kareo connect with you and finalize the ownership transfer? I haven't heard back from them since I sent the email and just want to confirm that everything is resolved." TAYLOR responded, "Yes absolutely we changed the w tire [sic] system over I appreciate you for all of your help I couldn't have done it without you." WITNESS 4 responded, "I'll advise [WITNESS 3] that the transition has taken place.  As I recall you also indicated that you deleted all patient accounts from the previous Beach Tox data based [sic] before you started collections, is that correct?"  WITNESS 4 could not find a response from TAYLOR to this email.

37.    On July 20, 2020, WITNESS 4 emailed TAYLOR about a patient who was complaining about fraudulent billing.  The patient with initials K.S. had called WITNESS 4 several times complaining about fraudulent billing by Beach Tox.  In the email WITNESS 4 stated, in

part, "[he/she] is complaining about fraudulent charges. All submitted by BEACHTOX – 3/1/20, 3/10/20, 3/20/20, 3/24/20, 4/14/20, 4/24/20, 5/14/20, 5/25/20, 5/30/20, 6/6/20, 6/16/20, 7/3/20… (I'm not sure I got all of the [sic] correctly documented). [He/She] goes to the [Clinic 1] . . . a group associated with [Laboratory 1]. We did run some of [his/her] tests through BeachTox in the past and still do testing for the [Clinic 1] – [his/her] last test was in 2019. Please check your billing records and let us know if you submitted claims on this patient in error and if they are to be corrected so I can contact the patient and advise. I would like to call [him/her] as soon as possible." Affiant knows Laboratory 1 to be a lab managed by Consulting Company 1 that performed lab testing for Consulting Company 1's clients, some of which were previously performed at Beach Tox when it was managed by Consulting Company 1.

38.     On July 20, 2020, TAYLOR responded, "Yes [he/she] was billed in error. These dates of service donappeae [sic] in our system we are tryi bj g [sic] to track down the appropriate patient now which will take some time. But we can see that this patient is not in our lims amd [sic] only in the kareo system. We will retract the claims and of [sic] they were paid issue refund obviously to the payers."

39.     Despite his statement on July 20, 2020, Medicare records showed that, after TAYLOR and INDIVIDUAL A purchased Beach Tox, Beach Tox nevertheless submitted Medicare claims for patient K.S. from April 16, 2020 to January 29, 2021, showing dates of service[3] from March 1, 2020 to January 7, 2021.

---

[3] The date of service reflects the date the service was purportedly performed; instantly, when the laboratory testing was performed, and not the date the claim was submitted.

**Significant Overlap In Referring Providers and Beneficiaries In Beach Tox's Billing**

40.     The Medicare claims data shows significant overlap between the beneficiaries billed at Vitas and those billed at Beach Tox. As of April 2021, 341 beneficiaries were billed by both labs, with each lab billing more than 9,000 claims for the overlapping beneficiaries—with approximately $5.8 million billed for these overlapping beneficiaries by Vitas and approximately $9.9 million billed for these overlapping beneficiaries by Beach Tox.

41.     In addition, the Medicare claims data shows significant overlap between the pre- and post-sale claims. Claims data as of April 2021 shows, of the 135 referring providers identified in Beach Tox's post-sale claims, 72 of the referring providers were also billed by Beach Tox prior to its sale to TAYLOR and INDIVIDUAL A. And, of the approximately 2,500 beneficiaries identified in Beach Tox's post-sale claims, approximately 2,100 of those beneficiaries were also billed by Beach Tox prior to the sale.[4] As discussed above, TAYLOR was instructed to delete the information pertaining to these referring providers and beneficiaries from the billing system. Based on my review of the claims data, TAYLOR did not do so.

**INDIVIDUAL A Signs Change of Ownership Forms, and TAYLOR and INDIVIDUAL A Become Authorized Users On Beach Tox Bank Accounts**

42.     As a result of the sale of Beach Tox to TAYLOR and INDIVIDUAL A, INDIVIDUAL A became the sole authorized person on the Beach Tox Chase Bank account on March 2, 2020 with TAYLOR being added as an authorized person on March 30, 2020. From March 2, 2020 (with the first Medicare payment occurring March 23) to October 19, 2020 (when the account was closed), Medicare paid approximately $13.6 million to the Beach Tox Chase Bank

---

[4] For purposes of these analyses, pre-November 2019 for the "pre-sale" time period and post-March 2020 through April 2021 as the "post-sale" time period were used.

account. Payments by Medicare constituted over 95% of the total deposits ($14,276,287.52) into the Beach Tox Chase Bank account.

43.     On November 10, 2020,[5] a Medicare enrollment application and EFT for Beach Tox were faxed from 479-551-2459 to Noridian Healthcare Solutions Inc., the Medicare contractor for Beach Tox located in North Dakota. The forms were submitted to show a change of ownership for Beach Tox to INDIVIDUAL A, with an effective date of September 30, 2020, and to change the authorization for Beach Tox's Medicare payments from the Beach Tox Chase Bank account to a Bank of Oklahoma account with account number ending 7502 (Beach Tox Bank of Oklahoma account). This account was opened on November 4, 2020, with an initial deposit of $60 and INDIVIDUAL A and TAYLOR as the authorized persons.

### Kareo Records Related to Beach Tox Billing

44.     Records were obtained from Kareo, the company used by Beach Tox for billing prior to the sale. These records showed that the Beach Tox account in the name of Consulting Company 1 was transferred to an account owned by TAYLOR in the name of Taylor Made Labs ("Kareo Beach Tox account"). On March 3, 2020, TAYLOR was added as a user on the Kareo Beach Tox account with email address taylormadelabs@yahoo.com. An email between TAYLOR and WITNESS 4 on that same date indicated that this account may have been set up by WITNESS 4 for another individual to use.[6] Other individuals were subsequently added as users on the Kareo Beach Tox account.

---

[5] Additional information was faxed to Noridian on 12/4/20, 12/8/20 and 1/15/21 to correct deficiencies in the original submission.

[6] On March 3, 2020, WITNESS 4 emailed TAYLOR, "Do you have a email for INDIVIDUAL D -- Or do you want me to use this email (referring to taylormadelabs@yahoo.com) for the User?" TAYLOR responded, "Use this one. Will be fine."

**F.   TAYLOR profited from the Beach Tox Fraud**

45.    Records for Beach Tox Chase Bank account show that on March 2, 2020, WITNESS 1 and another were removed as authorized persons, and INDIVIDUAL A was added as the sole authorized person on the account.  The records further show that on March 30, 2020, TAYLOR was added as a signatory on the Beach Tox Chase Bank account.

46.    From March 23, 2020 to October 19, 2020, Medicare payments totaling approximately $13.6 million were made to the Beach Tox Chase Bank account, which was closed on or about October 19, 2020.  On November 4, 2020, Beach Tox opened the Beach Tox Bank of Oklahoma account with an initial deposit of $60.  The authorized persons on this account were TAYLOR and INDIVIDUAL A.   On November 10, 2020, an EFT agreement signed by INDIVIDUAL A was submitted to Noridian changing the authorization for Medicare payments from the Beach Tox Chase Bank account to the Beach Tox Bank of Oklahoma account.  From February 9, 2021 to February 12, 2021 (with the first Medicare payment occurring February 9, 2021), Medicare payments totaling approximately $4.2 million were deposited into the Beach Tox Bank of Oklahoma account.  The balance on the account prior to the Medicare payment on February 9, 2021 was $9.  The total Medicare payments deposited in both the Beach Tox Chase Bank and Beach Tox of Oklahoma accounts was approximately $17.8 million.

47.    Bank records show from March 25, 2020 to September 9, 2020, TAYLOR directly transferred approximately $1.7 million from the Beach Tox Chase Bank account to the TAYLOR Chase Bank account.  On February 9, 2021, $1.5 million was transferred from the Beach Tox Bank of Oklahoma account to a second account at the Bank of Oklahoma on which TAYLOR was the sole authorized person.

**FALSE AND FRAUDULENT CLAIMS SUBMITTED BY VITAS AND BEACH TOX**

48.     Medicare records were obtained for claims submitted by Beach Tox with dates of service from January 1, 2017 through February 19, 2021 and by Vitas from January 1, 2017 to August 28, 2020.  From November 1, 2017 to May 1, 2020, Vitas submitted more than $23 million in Medicare claims and was paid approximately $7.8 million on these claims.  From March 9, 2020 to April 26, 2021, Beach Tox submitted more than $65 million[7] in Medicare claims and was paid approximately $21.3 million on these claims through April 26, 2021.

49.     During the time that the subject labs were owned and/or controlled by TAYLOR, the subject labs frequently submitted Medicare claims with CPT code G0483 which is a definitive drug test providing positive identification for 22 or more drug classes.  In addition, during the Covid-19 pandemic (i.e., beginning in or around January 31, 2020), many codes were bundled (or at least billed on the same day) with CPT Codes relating to testing for commonly ordered respiratory illnesses tests.

50.     The following categories of false and fraudulent claims to Medicare by Vitas and Beach Tox, as described below, were discovered over the course of this investigation:

**False and Fraudulent Medicare Claims Involving Deceased Beneficiaries**

51.     Both labs submitted false and fraudulent claims to Medicare with dates of service for lab tests occurring after Medicare records indicated beneficiaries had died.  Vitas submitted claims for 32 deceased beneficiaries between February 9, 2018 and September 3, 2019, totaling approximately $140,000 and Beach Tox claims for 181 deceased beneficiaries between March 12, 2020 and February 12, 2021, totaling approximately $1.2 million.

---

[7] By contrast, for a period of more than two years prior to the purchase of Beach Tox by TAYLOR and INDIVIDUAL A, from July 26, 2017 to October 28, 2019, Beach Tox submitted Medicare claims of approximately $5.3 million.

52.     The claims for deceased beneficiaries frequently involved claims being submitted after the beneficiaries' deaths for services that previously had been billed prior to their deaths. For example, Vitas submitted and was paid on claims for code G0483 for a beneficiary with initials S.B with dates of service prior to S.B.'s death.  After S.B.'s death on April 23, 2019, Vitas submitted 12 claims and Beach Tox 12 claims for code G0483 with dates of service after S.B.'s death.[8]  Similarly, Vitas submitted and was paid on claims for code G0483 for a beneficiary with initials D.P. with dates of service prior to D.P.'s death.  After D.P.'s death on January 21, 2019, Vitas submitted 15 claims and Beach Tox 12 claims with dates of service after D.P.'s death.  Vitas submitted and were paid on claims for code G0483 for a beneficiary with initials C.B with dates of service prior to C.B.'s death.  After C.B.'s death on April 28, 2019, Vitas submitted 14 claims and Beach Tox 13 claims with dates of service after C.B.'s death.

### False and Fraudulent Medicare Claims Involving Clinic 2

53.     From March 9, 2020 to February 17, 2021, Beach Tox submitted false and fraudulent claims to Medicare listing the names and NPIs of medical providers associated with Clinic 2 as the referring providers for more than $6.4 million and Medicare paid Beach Tox approximately $2 million on these claims.

54.     On February 24, 2021, law enforcement agents interviewed WITNESS 5, who has been employed as the billing manager for Clinic 2 for approximately twelve years.  WITNESS 5 described Clinic 2 as a pain management practice with locations in the Phoenix, Arizona metro area.  In 2020, WITNESS 5 received complaints from patients about charges on their benefit statements for lab tests purportedly performed by Beach Tox.  The charges were for lab tests for

---

[8] For the analyses regarding deceased beneficiaries, claims were tabulated through dates-of-service February 12, 2021.  There may be additional claims submitted for these beneficiaries after that date.

diseases which WITNESS 5 knew Clinic 2 did not order. WITNESS 5 was familiar with Beach Tox as Clinic 2 sent all its urine samples for testing to Laboratory 2 and WITNESS 5 knew Laboratory 2 had sometime referred these samples to Beach Tox. WITNESS 5 tried to contact Beach Tox regarding the billing complaints, but the number was disconnected.

55.    WITNESS 5 contacted the owner of Laboratory 2, WITNESS 6, who told WITNESS 5 that Beach Tox was sold in 2020 and Laboratory 2 had not referred any testing to Beach Tox after the sale. WITNESS 5 stated that any claims by Beach Tox for urine drug tests in 2020 would be fraudulent since WITNESS 6 told WITNESS 5 that Laboratory 2 had not sent urine sample to Beach Tox in 2020. (At a later date, agents interviewed WITNESS 6 who confirmed the information provided by WITNESS 5.)

56.    Records were obtained from Clinic 2 for all orders and results for laboratory testing from November 1, 2019 to February 28, 2021, for a sample of twenty individuals for whom Medicare claims had been submitted beginning March 9, 2020 for lab testing purportedly performed by Beach Tox. These claims listed a medical provider at Clinic 2 as the referring provider. For eight of these individuals, Clinic 2 had no records of lab orders or lab results and for the other twelve individuals, lab tests were ordered during the time frame, but these tests were performed by other laboratories and not by Beach Tox.

**False and Fraudulent Medicare Claims Involving PROVIDER 1**

57.    From September 17, 2018 to February 17, 2021, Medicare claims listing PROVIDER 1 and his/her NPI as the referring provider were submitted as follows: Vitas approximately $672,000 in claims (paid approximately $207,000) and Beach Tox approximately $6.1 million (paid approximately $2 million).

58.    On April 6, 2021, law enforcement agents interviewed PROVIDER 1. PROVIDER 1 stated that he/she specializes in chronic pain management and currently practices in Havre,

Montana for CLINIC 3. When PROVIDER 1 started working for CLINIC 3 in August 2018, the hospital used Vitas for lab testing. PROVIDER 1 stopped using Vitas in approximately March 2019[9] and began using Laboratory 3 exclusively since that time. PROVIDER 1 stated that he/she never sent samples for lab testing to Beach Tox.

59.     A large number of claims submitted by Beach Tox which listed PROVIDER 1 as the referring provider were for tests involving CPT codes 87150 (identification of organism by genetic analysis), 87541 (detection for Legionella Pneumophila, a water-borne bacteria), 87631 (detection test for multiple types of respiratory virus), 87640 (detection for Staphylococcus aureus), 87651 (detection test for Strep) and 87798 (Detection Test By Nucleic Acid For Organism). From April 3, 2020 to February 17, 2021, Beach Tox submitted claims for all these codes listing PROVIDER 1 as the referring provider totaling approximately $4.2 million and were paid approximately $1.2 million on these claims.

60.     PROVIDER 1 was asked about ordering these types of tests. PROVIDER 1 stated he/she would not have ordered detection tests by nucleic acid for organism (87798), tests for respiratory viruses (87631), tests for Legionella Pneumophila (87451) or identification of organism by genetic analysis (87150). PROVIDER 1 stated, if he/she ordered tests for staph (87640) or strep (87651), they were sent to CLINIC 3 which had its own lab for these tests.

### False and Fraudulent Medicare Claims Involving PROVIDER 2

61.     From May 4, 2018 to February 16, 2021, Medicare claims listing PROVIDER 2 and his/her NPI as the referring provider were submitted as follows: Vitas approximately $2.4

---

[9] Vitas submitted claims of approximately $360,000 with dates of service after March 2019 from April 4 to July 31, 2019.

million in claims (paid approximately $893,000) and Beach Tox approximately $1.4 million (paid approximately $442,000).

62.      On March 9, 2021, law enforcement agents interviewed PROVIDER 2 regarding Medicare claims submitted using his/her name and NPI as the referring medical provider. PROVIDER 2 stated he/she had never ordered or reviewed any lab tests for his/her patients from Beach Tox. PROVIDER 2 treated patients at Clinic 4 and routinely ordered monthly urine drug tests for patients receiving opioids. PROVIDER 2 knew that Clinic 4 used Vitas for lab testing for a period and identified WITNESS 7 as the person at Clinic 4 who would know when the clinic used Vitas for urine drug testing.

63.      On March 18, 2021, law enforcement interviewed WITNESS 7, the CEO of Clinic 4. WITNESS 7 stated Clinic 4 began operating a medical clinic in Pocola, Oklahoma in 2017, and, for a time, operated clinics in both Pocola and Poteau, Oklahoma. PROVIDER 2 worked part time at these clinics. Clinic 4 used Vitas for urine drug testing beginning in 2018, but ceased using Vitas and began using another lab for urine drug testing in approximately May 2019 because Vitas was not providing lab results in a timely fashion. WITNESS 7 was not familiar with Beach Tox and stated that Clinic 4 never submitted samples to Beach Tox for testing.

64.      Records were obtained from Clinic 4 for orders and results for laboratory testing for beneficiaries for whom the subject labs submitted Medicare claims. These records were inconsistent with the claims submitted by the both labs. For example, Vitas submitted 53 claims*[10] from June 11, 2018 to July 4, 2019 and Beach Tox 22 claims for code G0483 for a beneficiary

---

[10] The billing of multiple claims for the same code with the same date of service occurred for both labs and represents additional instances of fraudulent billing. Where multiple claims are billed for the same test on the same date of service, only one claim is counted for purpose of this Affidavit. Claims numbers which include multiple billing for the same date of service are designated with an "*."

with initials W.H. listing PROVIDER 2 as the referring provider. Clinic 4 records for W.H. showed 12 lab results by Vitas for specimens collected in 2018 and 2019 with 6 of these showing Laboratory 4 as the lab actually performing the lab tests. There were no lab tests in the Clinic 4 medical records for W.H. that were performed by Beach Tox.

65.     Vitas submitted 48 claims* from July 24, 2018 to July 4, 2019 and Beach Tox 24 claims* for code G0483 for beneficiary with initials S.M. listing PROVIDER 2 as the referring provider. Clinic 4 records for S.M. showed 7 lab results by Vitas for specimens collected in 2018 and 2019, with 4 of these showing Laboratory 4 actually performing the lab tests. There were no lab tests in the Clinic 4 medical records for S.M. that were performed by Beach Tox.

66.     Vitas submitted 38 claims* from April 13, 2018 to July 21, 2019, and Beach Tox 21 claims* for code G0483 for beneficiary with initials A.R. listing PROVIDER 2 as the referring provider. Clinic 4 records for A.R. showed 6 lab results by Vitas[11] for specimens collected in 2018 and 2019 with 2 showing Laboratory 4 actually performing the tests. There were no lab tests in the Clinic 4 medical records for A.R. that were ordered to be performed by Beach Tox.

### False and Fraudulent Medicare Claims Involving PROVIDER 3

67.     From March 20, 2019 to February 16, 2021, both labs submitted Medicare claims listing PROVIDER 3 and his/her NPI as the referring provider as follows: Vitas approximately $1.5 million in claims (paid approximately $563,000) and Beach Tox approximately $1 million (paid approximately $363,000).

68.     On July 27, 2020, law enforcement agents interviewed PROVIDER 3 who stated he/she began working one day a week at Clinic 5 before it was sold to TAYLOR and others.

___
[11] Two of the lab tests do not clearly show what lab performed the test, but for purposes of this Affidavit they are counted as Vitas tests.

WITNESS 8, the previous owner of Clinic 5, told law enforcement agents the clinic was opened in approximately 2018 and sold to TAYLOR and others on March 15, 2019 and did not use Vitas for lab tests when he/she owned the clinic. After the change in ownership, PROVIDER 3 agreed to continue seeing patients two days a week. On September 21, 2019, one of the owners of Clinic 5 informed PROVIDER 3 they found someone to replace him/her. PROVIDER 3 saw no patients at Clinic 5 on or after September 19, 2019.

69.     PROVIDER 3 stated Clinic 5 used Vitas for lab testing during the time it was owned by TAYLOR. PROVIDER 3 was asked if he/she had heard of Beach Tox and stated it did not ring a bell. When told that there were Medicare claims listing him/her as the referring provider Beach Tox in 2020, PROVIDER 3 stated that he/she did not refer or order the labs related to these claims. PROVIDER 3 explained that, in 2020, he/she practiced at a clinic in Tulsa and had no need to order toxicology tests since his/her practice was predominantly Botox filler and some hormones. PROVIDER 3 stated he/she had not ordered a urine drug screen in a long time and, if he/she did order one, he/she would send it to Laboratory 5.

70.     On October 9, 2020, law enforcement emailed PROVIDER 3 a list with the names, addresses and genders of more than 60 beneficiaries for whom Beach Tox submitted Medicare claims in 2020 listing PROVIDER 3 as the referring provider. On October 21, 2020, PROVIDER 3 responded by email that he/she had not ordered lab testing in 2020 for any of the beneficiaries on the list.

**False and Fraudulent Medicare Claims Involving PROVIDER 4**

71.     From November 13, 2017 to February 16, 2021, the subject labs submitted Medicare claims listing PROVIDER 4 and his/her NPI as the referring provider as follows: Vitas approximately $1.6 million in claims (paid approximately $563,000) and Beach Tox approximately $862,00 (paid approximately $281,000).

72.     On July 10, 2020, law enforcement interviewed PROVIDER 4 who stated he/she has worked at Clinic 6 in Bonanza, Arkansas since June 2017.  At one time, TAYLOR was an owner of the clinic but PROVIDER 4 believed that WITNESS 2 is the current owner of the clinic. PROVIDER 2 became PROVIDER 4's supervising physician in August 2017 but later terminated that relationship advising him/her that it was due to trouble PROVIDER 2 was having with Blue Cross.

73.     PROVIDER 4 ordered urine drug tests for patients receiving narcotics normally done every 30 days and for a time these were sent to Vitas for testing.  PROVIDER 4 complained to the office manager that he/she was not receiving Vitas lab results in a timely manner, but the problem continued.  Some samples sent to Vitas would show testing performed by other labs and PROVIDER 4 was told by the office manager that Vitas was sending samples to reference labs because of something to do with CLIA.  PROVIDER 4 stated that his/her clinic is not currently using Vitas and has not used them for a long time.

74.     On October 22, 2020, law enforcement emailed PROVIDER 4 the names, addresses and genders of patients for twenty-one patients for whom Beach Tox submitted Medicare claims listing PROVIDER 4 and his/her NPI as the referring provider.  On October 22, 2020, PROVIDER 4 responded by email that he/she had only heard of Beach Tox because a patient brought in a bill with charges from Beach Tox.  PROVIDER 4 verified that his/her clinic did not send anything to Beach Tox.

### False and Fraudulent Medicare Claims During The Covid-19 Pandemic

75.     During the Covid-19 public health emergency,[12] Beach Tox billed more than $42 million in claims, and was paid more than $11 million, for codes bundled (or at least billed on the

---

[12] For purposes of this analysis, this spans from February 1, 2020 through April 26, 2021.

same day) with one or more of these CPT Codes that relate to testing for respiratory illnesses: 87798 (Detection test by nucleic acid for organism, amplified probe technique); 87150 (Identification of organisms by genetic analysis, amplified probe technique); 87631 (Detection test by nucleic acid for multiple types of respiratory virus, multiple types or subtypes, 3-5 targets); 87541 (Detection test by nucleic acid for legionella pneumophila (water borne bacteria), amplified probe technique); 87640 (Detection test by nucleic acid for Staphylococcus aureus (bacteria), amplified probe technique); and 87631 (Detection test by nucleic acid for multiple types of respiratory virus, multiple types or subtypes, 3-5 targets). In this affiant's training and experience, and based on evidence reviewed in connection with this investigation, it appears that Beach Tox bundled testing that appeared to be connected with the public health emergency with other more lucrative and medically unnecessary testing. None of the beneficiaries who were interviewed in connection with this investigation received any test results from Beach Tox that were related to COVID-19 or other respiratory illnesses, and such testing was never conducted by Beach Tox at all.

## V.   CONCLUSION

76.     Based upon the foregoing, I submit that this affidavit sets forth sufficient facts to establish probable cause to believe that, from in or around November 2017, and continuing through in or around April 2021, in Sebastian County, in the Western District of Arkansas, and elsewhere, BILLY JOE TAYLOR, together with others, committed health care fraud, that is, to knowingly and willfully execute, and attempt to execute, a scheme to defraud any health care benefit program and to obtain, by means of false and fraudulent pretenses, representations, and promises, any of the money and property owned by, and under the custody and control of, any health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Sections 1347 and 2.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief this 25th day of May 2021, in Fort Smith, Arkansas.

FURTHER AFFIANT SAYETH NAUGHT.

Respectfully submitted,

Matthew Ferguson
Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me on this 21 day of May, 2021.

HONORABLE MARK E. FORD
UNITED STATES MAGISTRATE JUDGE